UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60285CF10A

UNITED STATES OF AMERICA,
   Plaintiff.

vs.

JAYSON GUTIERREZ,
   Defendant.
_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, Jayson Gutierrez, through counsel, respectfully submits this sentencing memorandum in advance of his sentencing scheduled for March 1, 2022.

**INTRODUCTION**

Mr. Gutierrez entered a guilty plea to Count two of the indictment charging him with possession with intent to distribute 50 grams or more of methamphetamines.

**ANALYSIS OF SENTENCING FACTORS UNDER 18 U.S.C. §3553 AND SUGGESTION OF SENTENCE**

The defendant's total offense level as determined by the Presentence Report is 27 and his criminal history is category of V. This puts the defendant in a guideline imprisonment range of 120 to 150 months. The minimum term of imprisonment is 10 years. The defendant submits to the Court that a reasonable sentence is the bottom of the guideline range, 120 months.

## **DISCUSSION AND SENTENCING FACTORS FOR THE COURT'S CONSIDERATION**

The defense takes the position that a sentence of 120 months is just punishment in this case. Such a sentence is reasonable, sufficient and appropriate considering the factors set forth in 18 U.S.C. §3553(a).

That statute provides:

> The court shall impose a sentence **sufficient, but not greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>
> (1)   the nature of the circumstances of the offense and the history and characteristics of the defendant;
>
> (2)   the need for the sentence imposed –
>
>    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>    (B)   to afford adequate deterrence to criminal conduct;
>
>    (C)   to protect the public from further crimes of the defendant; and
>
>    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3)   the kinds of sentences available;
>
> (4)   the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines . . . .
>
> (5)   any pertinent [Guidelines] policy statements . . . .
>
> (6)   the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   The need to provide restitution to any victims of the offense.

[Emphasis added.)

The defendant suggests for the court's consideration the following in support of his request:

**(1) <u>The Nature Of The Offense And the History Of The Defendant</u>**

(a) <u>Mr. Gutierrez's post-arrest interview and acceptance of responsibility in resolving the instant charges</u>:

The offense to which the defendant pled involved the sale of $1900.00 of 113.38 grams of "Ice". There was no violence or possession of weapons associated with the defendant's conduct. The defendant entered a guilty plea, agreed with the factual basis, and as noted in the PSR accepts full responsibility for his conduct. After his arrest and indictment, the defendant met with AUSA Donald Chase and agents (on two occasions) to be interviewed regarding his role and conduct in this case, as well as his knowledge of other related matters. Although the defendant does not qualify for Safety Valve because of his criminal history points, he provided a statement that would meet the criteria for §5C1.2(5).

(b) <u>History and characteristics of the defendant</u>:

<u>Defendant's drug abuse and mental health history:</u>

Mr. Gutierrez was interviewed by Dr. Barton Jones, PhD. Dr. Jones conducted a psychological evaluation of Mr. Gutierrez and prepared a report. (Exhibit A). Mr. Gutierrez has been abusing and using methamphetamine daily for over 9 years. As noted in the PSR, he started self-medicating with methamphetamine to address his diagnosed Narcolepsy condition. Using a substance abuse assessment tool, Dr. Jones concluded that his responses support a high probability of moderate to severe substance abuse

3

disorder. As further noted, his responses did not indicate that he was being defensive regarding his history of substance abuse. (Exhibit A, report at page 5). In conjunction with his substance abuse, the defendant also suffers from depressive symptoms for which he also used methamphetamine to self-medicate. Again, through his testing, Dr. Jones concluded that the defendant was not engaging in malingering of symptoms of mental illness. (Exhibit A, pages 5-6). Finally, Dr. Jones has determined that Mr. Gutierrez is amenable to mental health and substance abuse treatment. (Exhibit A, pages 10-11).

Mr. Gutierrez would submit that in large part, the instant criminal behavior is the result of his addiction to and continued daily use of methamphetamine. A review of his criminal history supports this. The majority of the defendant's state convictions are all drug related (possession allegations). His petit theft convictions is consistent with behavior associated with substance abuse and addiction.

**(2) The need for the sentence imposed**

The second factor under §3553(a) – the need for the sentence to punish, deter, protect the public, and rehabilitate – also supports the requested sentence. There is no evidence indicating that the defendant engaged in any violence in relation to his crimes. Therefore, a sentence at the high end of the agreed guideline (150 months) is not necessary to protect the public and punish Gutierrez. A sentence at the low end (120 months) is just punishment in this case. A ten-year prison sentence certainly sends a message and will discourage the defendant and others from engaging in the same offense.

### (3)-(4) The Sentences Available

The maximum term of imprisonment is Life. As noted and agreed, the guideline imprisonment range is 120 to 150 months. Therefore, a sentence of 120 months is available and reasonable.

## CONCLUSION

The defendant has paid a great price for his conduct. He will now at a minimum be sentenced to at least a decade in prison. The defendant has a very supportive family that will be there for him and continue their support for him while he is incarcerated. They will also provide support for him after his release. For the foregoing reasons, defendant respectfully submits that a sentence of 120 months is sufficient, but not greater than necessary, to comply with the purposes 18 U.S.C. §3553, and is a just and reasonable sentence in this case.

The defendant is requesting that the Court recommend in imposing sentence that he participate in the RDAP drug program and recommend that he serve his prison sentence at FCI Miami or FCI Coleman low or medium.

Respectfully submitted,

/s/<u>Sidney Z. Fleischman</u>
Fleischman & Fleischman, P.A.
Sidney Z. Fleischman
800 E. Broward Blvd., #402
Ft. Lauderdale, Florida 33301
Phone  954-523-7223
Fax    954-523-4840
Fla. Bar No. 762962
Email: sf@ffjustice.com

5

## **Certificate of Service**

I hereby certify that on the 21st day of February, 2022, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on the U.S. Attorney's Office, Ft. Lauderdale, FL.

/s/  *Sidney Z. Fleischman*
Sidney Z. Fleischman

# Barton L. Jones, PhD
Licensed Psychologist
FL#: PY0005290

| Office Address: | Telephone/Fax: | Mailing Address: |
|---|---|---|
| 10031 Pines Blvd. Suite 212 | (954) 684-4564 | PO Box 820855 |
| Pembroke Pines, FL | (954) 674-2294 | South Florida, FL 33082-0855 |

## PSYCHOLOGICAL EVALUATION REPORT
## (EX-PARTE EVALUATION)

Regarding: **Jayson Gutierrez**
Date of Birth: **9-28-77**
Case Number: **21-60285-CR-Dimitrouleas**
Evaluated By: **Barton L. Jones, Ph.D.**
Date of Evaluation: **February 10, 2022**

### Reason for Referral:

Jayson Gutierrez was referred for an ex-parte psychological evaluation for mitigation purposes by his attorney, Sidney Z. Fleischman, Esq.

### Evaluative Procedures:

Clinical interview and Mental Status Examination; Wide Range Achievement Test- Fifth Edition (WRAT-5); Beck Depression Inventory- Second Edition (BDI-2); Beck Hopelessness Scale (BHS); Beck Scale for Suicide Ideation (BSS); Beck Anxiety Inventory (BAI); Miller- Forensic Assessment of Symptoms Test (M-FAST); Substance Abuse Subtle Screening Inventory- Fourth Edition (SASSI-4); Personality Assessment Inventory (PAI); a review of his arrest information and indictment; a review of a report from an evaluation which was conducted by Michael P. Brannon, Psy.D., dated August 13, 2017; and a telephone interview with the defendant's mother, Maria Gutierrez. The defendant was informed of the purpose of this evaluation and the limits of confidentiality. He agreed to participate in this evaluation. The evaluation was conducted at the Miami Federal Detention Center.

### Relevant Background:

Jayson Gutierrez is a 44 year old Caucasian, Hispanic, male. He and his mother indicated that he was born in Elizabeth, New Jersey. His family relocated to Florida

when he was a child. He denied any history of abuse or exposure to domestic violence in childhood. This was confirmed by his mother. He and his mother also denied any history of involvement with the Department of Children and Families.

He described his relationship with his father in positive terms. Regarding his father, he stated, "I love him, admire him". He indicated that he feels close to his father. He recalled that when he was growing up they "used to go fishing and play baseball". He indicated that his father had been his Little League coach and described his father as a "great" father. He went on to say that "he was just a good role model and spent a lot of time with us, very supportive". He also indicated that his father was "very much business, no nonsense". He noted that his parents owned a medical equipment company and that he had worked for them in the past. This was confirmed by his mother.

He and his mother reported that his mother also worked in the family medical equipment company. He noted that his mother was "also very supportive". He indicated that "I love her very much" and recalled that they used to go shopping together and that his mother watched him play baseball when he was a child. He went on to say that "I can't say anything bad about either one of them, I had the perfect upbringing, really". He indicated that he feels that he has disappointed his parents, "very much so" and that he becomes depressed if he allows himself to think about this. He indicated that he believed that they had hoped he would "become somewhat successful with career and family".

He and his mother indicated that he has one sibling, a 46 year old sister. He reportedly gets along well with his sister who is married with two children. His mother indicated that Jayson has always participated in family gatherings at his sister's house and that as a family "we are very close". He and his mother denied that he exhibited any significant behavioral difficulties in childhood or adolescence. They denied that he had any history of running away from home, fire-setting or cruelty to animals. His mother indicated that "when we disciplined him, he would never answer back, he would listen and go to his room and cry".

He was raised by his parents and continued to live with them until leaving home to attend college at Santa Fe Community College in Gainesville, Florida. However, he and his mother noted that he struggled academically and emotionally. His mother noted that he was diagnosed with Narcolepsy and ADHD at that time. She further explained that he became depressed and described himself as "stupid" and "not smart". She recalled that the physician who had treated him had given him a letter to be delivered to the college administration to allow for special academic considerations, but that Jayson was "embarrassed and depressed that he couldn't handle it" and did not provide the letter to

the college administration. He and his mother noted that he subsequently dropped out of college and returned home. He noted that he was using drugs regularly and was arrested for drug trafficking. He and his mother noted that he spent approximately one year in prison beginning at the age of 23 and that he had also been placed on probation.

He and his mother denied that he has ever married or that he has any children. They noted that he has lived with three different girlfriends. The first relationship lasted for approximately three years and the second for approximately five years. His relationship with his current girlfriend has spanned approximately five years. He and his mother denied any history of domestic violence in his relationships with his girlfriends.

With respect to peer relationships, he indicated that he has many friends, but only one friend whom he believes he is able to trust. He admitted that most of his friends have a history of substance abuse and arrest. He denied that he was a victim of bullying or teasing in childhood and adolescence. His mother described him as "a helpful person" and noted that "he brought home friends who were in need" and that some had even stayed in his parents' home.

He reportedly experienced one incident of violent crime, having been stabbed in the back at a nightclub when he was in his 20s. He described the loss of four friends who have died of drug overdose. The first of these deaths occurred when he was approximately 30 years old and the last was approximately two years ago. He indicated that he was saddened by the deaths of his friends. No other traumatic experiences or significant losses were reported. He indicated no trauma symptoms in response to these events.

**Educational and Vocational History:**

He and his mother indicated that he had graduated from Cardinal Gibbons High School. He was reportedly placed in regular education classes. He and his mother denied that he had ever failed a grade. No behavioral difficulties were noted during his school years. He and his mother indicated that he had played on the high school varsity baseball team. As was noted above, he attended two years at Santa Fe Community College in Gainesville, Florida. However, he had struggled in college and was ultimately diagnosed with Narcolepsy and ADHD, further struggling with depression. He dropped out of college without graduating. No other educational programming or vocational training was reported.

He and his mother reported that he has a history of employment including work in home remodeling, at a GNC store, and in marketing for his parents' medical equipment

**Jayson Gutierrez**                                                                                                          Page 4 of  11

company. They denied that he had ever been fired from a job. No other employment was reported. A history of military service was denied. He and his mother denied that he has ever received Social Security disability benefits.

**Medical History:**

He and his mother indicated that he was diagnosed with Narcolepsy. Jayson estimated that this had occurred when he was approximately 15 years old, but his mother was adamant that it occurred when he was attending college at Santa Fe Community college and she estimated that he was 18 years old at the time. He was reportedly prescribed Adderall and Ritalin to treat the Narcolepsy. In addition, they reported that he was stabbed in the back and underwent treatment at the Broward Health Medical Center where he was reportedly admitted for approximately one day. He and his mother noted that he has experienced kidney stones and kidney failure, requiring hospitalization at Holy Cross Hospital and Imperial Point Hospital. No other significant medical conditions were reported. His mother indicated that he was born full-term and that she experienced no difficulties with his pregnancy or delivery. He was born via cesarean section. His mother indicated that he experienced no developmental delays.

**Substance Abuse History:**

Regarding his use of substances, he indicated that he had first tried alcohol and marijuana at approximately the age of 15. He indicated that he had rarely used these substances. He estimated that he last used marijuana approximately two years ago and that he last used alcohol when he was in his 30s. He reported that he began using methamphetamine at the age of 35 and reported daily use of this substance until his arrest. He denied the use of any other substances. He denied that he had ever lost consciousness as a result of his use of substances. He explained that he had begun using methamphetamine because of his Narcolepsy, noting that "it's tough walking around, like half-asleep, all the time".

He noted that he had once participated in substance abuse treatment in the Broward County Jail in 2016. This was confirmed by his mother. He and his mother indicated that his father had used alcohol in the past to assist with sleep, but his mother noted that his father had stopped using alcohol since beginning treatment for depression. No other family history of substance use was reported.

The Substance Abuse Subtle Screening Inventory- Fourth Edition (SASSI-4) is a substance abuse assessment tool that was designed to provide information regarding the possible presence and severity of drug and/or alcohol abuse. It provides validity scales to assess for random and defensive responding. His responses were suggestive

of a high probability of moderate to severe substance use disorder. His responses were consistent with his reported abuse of substances, as described above. His responses did not suggest that he was being defensive regarding his history of substance abuse.

**Mental Health Treatment History:**

He and his mother denied that he has ever been psychiatrically hospitalized. He reported that he had been diagnosed with ADHD at approximately the age of 15, but his mother noted that he was diagnosed with Narcolepsy and ADHD at the age of 18, as was indicated above. He was prescribed Adderall and Ritalin. He and his mother also reported that he had been depressed when he was struggling in college and when he returned home. He denied any other history of outpatient psychiatric treatment. He denied that he was prescribed psychotropic medications in prison or during his current placement in the Federal Detention Center. He had resorted to the use of methamphetamine to counter both is Narcolepsy and depressive symptoms. He reported that he had participated in several counseling sessions which also included his father, after he was released from prison. This was confirmed by his mother. He also reported that he had participated in anger management classes in 2016. He expressed openness to mental health treatment services in the future. When asked about a family history of mental illness, he and his mother indicated that his father has been receiving psychiatric treatment for depression. No other family history was reported.

**Clinical Interview and Mental Status Examination:**

He was of average height with a medium build. His hair was shaved. He wore a growth of mustache and beard. He reported that he had no tattoos. He was adequately groomed. He was dressed appropriately. He appeared his stated age. He wore a facemask in accordance with COVID-19 precautions.

Eye contact was appropriate. He ambulated without difficulty. Psychomotor movements were within normal limits. No tics, spasms or tremors were noted.

He was calm and cooperative. He was easily engaged in testing tasks. He appeared to put forth adequate effort. Mood was reported as "good". Affect was appropriate. Speech productivity, rate and volume were within normal limits.

He was oriented to person, place and generally to time (he knew the month, year and day of the week, but not the date). Concentration and attention were adequate. Thought processes were logical and goal directed. Abstraction ability was adequate. Immediate auditory recall and remote memory were grossly intact, on interview. Recent memory functioning appeared to be fair, on interview. He appeared during the interview portion of the evaluation to be functioning in the average range of intelligence.

He denied auditory, visual, gustatory, olfactory or tactile hallucinations. None were reported, on his part, by his mother. He did not appear to be responding to internal stimuli at the time of this evaluation. No impairment in self perception was reported. He expressed no delusional beliefs.

Judgement and insight were adequate. He denied suicidal ideation, intent or plan. He denied any history of suicide attempts. Furthermore, his mother indicated that she was not aware of any suicide attempts, on his part. He denied homicidal ideation, intent or plan.

He and his mother reported that he has experienced persistent but low level depressive symptoms since experiencing difficulties in college and subsequently dropping out. He described recurrent depressed mood for several weeks at a time and more days than not during the years since he dropped out of college. Has reportedly experienced sleep disturbance, low energy, low self-esteem, feelings of failure, feelings of guilt, feelings of worthlessness, concentration difficulties and difficulties making decisions. No other mood or anxiety disorder symptoms were reported. No other symptoms were reported.

On the Miller- Forensic Assessment of Symptoms Test (M-FAST), a brief structured interview designed to assess an individual's probability of malingering psychiatric illnesses, his responses resulted in a score of zero, which failed to suggest that he was engaging in malingering of symptoms of mental illness.

**Academic Functioning:**

A standardized test of academic achievement, the Wide Range Achievement Test - Fourth Edition (WRAT-4), was administered during this evaluation. He obtained the following age normed scores, percentiles and grade equivalents:

| Subtest | Standard Score | Percentile | Grade Equivalent |
|---|---|---|---|
| Word Reading | 97 | 42 | >12.9 |
| Sentence Comprehension | 101 | 53 | >12.9 |
| Reading Composite | 98 | 45 | - - |

His performance on this administration of the WRAT-4 indicated that he functioned in the average range as compared to his same age peers in word reading, which involves decoding/correctly pronouncing words. He functioned within the average range as compared to his same age peers in sentence comprehension. His reading composite score also fell within the average range. His performance overall was consistent with his estimated level of intellectual functioning and with his reported educational history.

**Emotional Functioning:**

His responses on the Beck Depression Inventory- Second Edition (BDI-2), one of the most commonly used brief assessment scales for symptoms of depression, resulted in a total score of twelve (12), indicating a minimal level of depressive symptoms over the two weeks before this evaluation. He reported a history of depressive disorder symptoms since early adulthood. This was confirmed by his mother.

His responses on the Beck Hopelessness Scale (BHS), one of the most commonly used brief assessment scales for hopelessness, resulted in a score of three (3), failing to indicate a significant level of hopelessness. Elevated scores have been found to be predictive of eventual suicide in depressed suicide ideators who were followed for five to 10 years after discharge from a hospital. Hopelessness has been found to be a better predictor of suicidal intention than depression and therefore, patients describing moderate to severe level of hopelessness should be closely scrutinized for suicide potential. His current score fails to raise concern over a significant level of feelings of hopelessness. His score, taken in conjunction with his minimal level of depressive symptoms as noted on the BDI-2, does not raise concern over an increased likelihood of future acts of self harm and suicide attempts. He denied that he has a history of suicide attempts. This was confirmed by his mother.

His responses on the Beck Scale for Suicide Ideation (BSS), one of the most commonly used brief assessment scales for suicidal ideation, resulted in a score of zero (0), which does not raise concern over the possibility of more imminent suicidal acts. He denied current suicidal ideation, intent or plan. As was noted above, he denied that he has a history of suicide attempts. This was confirmed by his mother.

His responses on the Beck Anxiety Inventory (BAI), one of the most commonly used brief assessment scales of anxiety symptoms, resulted in a score of three (3), which indicated a minimal level of anxiety in the week prior to his evaluation. He expressed concern over his current legal situation, but he reported no other significant anxiety symptoms.

The Personality Assessment Inventory is a 344 item multi-scale inventory designed for clinical assessment of adults age 18 years and older. It was also administered to the defendant. The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness.

His responses resulted in the following T-scores on the instrument's various scales:

**Jayson Gutierrez**                                                                 Page 8 of 11

| Cluster 1 (Validity scales): | T- scores |
|---|---|
| Inconsistency (ICN) | 49 |
| Infrequency (INF) | 63 |
| Negative Impression (NIM) | 44 |
| Positive Impression (PIM) | 48 |
| | |
| Cluster 2 (Clinical Scales): | |
| Somatic Complaints (SOM) | 48 |
| Anxiety (ANX) | 54 |
| Anxiety-Related Disorders (ARD) | 45 |
| Depression (DEP) | 55 |
| Mania (MAN) | 38 |
| Paranoia (PAR) | 64 |
| Schizophrenia (SCZ) | 53 |
| Borderline Features (BOR) | 61 |
| Antisocial Features (ANT) | 58 |
| Alcohol Problems (ALC) | 47 |
| Drug Problems (DRG) | 84 |
| | |
| Cluster 3 (Treatment Considerations): | |
| Aggression (AGG) | 67 |
| Suicidal Ideation (SUI) | 43 |
| Stress (STR) | 62 |
| Non-Support (NON) | 61 |
| Treatment Rejection (RXR) | 48 |
| | |
| Cluster 4 (Interpersonal Scales): | |
| Dominance (DOM) | 40 |
| Warmth (WRM) | 40 |

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness. For this protocol, the validity indices did not suggest a significant level of distortion.

The PAI clinical profile is marked by a significant elevation on the DRG scale, indicating that the content addressed by this scale may reflect a particular area of difficulty for the respondent. The respondent indicates that his use of drugs has had many negative consequences on his life at a level that is above average even for individuals in specialized treatment for drug problems. Such a pattern indicates that his use of drugs

has had numerous ill effects on his functioning. Problems associated with drug abuse are probably found across several life areas, including strained interpersonal relationships, legal difficulties, vocational failures, financial hardship, and/or possible medical complications resulting from prolonged drug use. He acknowledged having little ability to control the effect that drugs are having on his life. With this level of problems it is increasingly likely that he is drug-dependent and withdrawal symptoms may be a part of the present clinical picture. This is consistent with his reported history of drug use noted during other portions of the evaluation.

The respondent describes himself/herself as being more wary and sensitive in interpersonal relationships than the average adult. Others are likely to see the client as tough-minded and skeptical. He may be preoccupied with fears of being abandoned or rejected by those people important to him.

According to the respondent's self-report, he/she describes NO significant problems in the following areas: unusual thoughts or peculiar experiences; problems with empathy; unhappiness and depression; unusually elevated mood or heightened activity; marked anxiety; problematic behaviors used to manage anxiety; difficulties with health or physical functioning.

The self-concept of the respondent appears to involve a fixed, rather negative self-evaluation. The client is likely to be self-critical and to focus upon past failures and lost opportunities. The client may be more troubled inwardly by self-doubt and misgivings about his/her adequacy than is apparent to others. The client may tend to play down his successes as a result, dismissing such accomplishments as either good fortune or the result of the efforts of others.

The respondent's interpersonal style seems best characterized as withdrawn and introverted. The client likely appears to others as if he has little interest in socializing. The client is likely to be rather passive and distant. In considering the social environment of the respondent with respect to perceived stressors and the availability of social supports with which to deal with these stressors, his responses indicate that he is likely to be experiencing a mild degree of stress as a result of difficulties in some major life area. Some of these stressors may involve relationship issues because he experiences his level of social support as being somewhat lower than that of the average adult. This is consistent with his current incarceration.

Treatment considerations involve issues that can be important elements in case management and treatment planning. Interpretation is provided for three general areas relevant to treatment: behaviors that may serve as potential treatment complications, motivation for treatment, and aspects of the respondent's clinical picture that may

**Jayson Gutierrez**                                                                 Page 10 of 11

complicate treatment efforts. With respect to anger management, the respondent describes himself as being rather impatient and easily irritated. However, he did not report any specific aggressive behaviors that are recurrent problems for the client. With respect to suicidal ideation, the respondent is not reporting distress from thoughts of self-harm. The respondent's interest in and motivation for treatment is comparable to that of adults who are not being seen in a therapeutic setting. The client's responses suggest that he is satisfied with himself as he is, that he is not experiencing marked distress. He reported a number of strengths that are positive indications for a relatively smooth treatment process.

**DSM-5 Diagnostic Impression:**

      Persistent Depressive Disorder (Dysthymia)
      Stimulant (Methamphetamine) Use Disorder, in a controlled environment
      Unspecified Attention Deficit Hyperactivity Disorder, by history, Provisional

**Summary and Recommendations:**

Jayson Gutierrez is a 44 year old Caucasian, Hispanic, male. He has reportedly been diagnosed with Narcolepsy, ADHD and has experienced depressive symptoms since he was in college. Both he and his mother denied that he has any history of psychiatric hospitalizations. They also denied that he has received outpatient psychiatric treatment. He had apparently been prescribed stimulant medication for his Narcolepsy and ADHD, but apparently did not continue with treatment. He noted that he has abused Methamphetamine in an attempt to deal with his Narcolepsy and depressive symptoms. It was also reported that he had briefly attended psychotherapy treatment in the past. He and his mother also noted that he had once participated in substance abuse treatment in the Broward County Jail.

His responses on formal assessments regarding substance abuse did not indicate defensiveness regarding his past use of substances. Furthermore, his responses on the Personality Assessment Inventory and the Miller Forensic Assessment of Symptoms Test, did not suggest that he was attempting to malinger or exaggerate symptoms of mental illness.

He appears to perceive family relationships and his relationship with his girlfriend in positive terms. He displayed good insight, expressing remorse over previous inappropriate behavior. He appeared to be amenable to mental health and substance abuse treatment. His reported history of academic performance, college attendance and his reading ability all suggest that he is able to participate in a variety of therapeutic interventions, including those which involve the use of bibliotherapy.

**Jayson Gutierrez**                                                                         Page 11 of 11

It is recommended that he participate in long-term residential, dual-diagnosis, mental health and substance abuse treatment. In addition to substance abuse treatment services, individual/group psychotherapy services should assist him in exploring his emotions and cognitions which perpetuate his persistent depressive symptoms and should also assist him in enhancing his social skills and coping skills. Upon his return to the community, it is recommended that he receive outpatient mental health and substance abuse treatment.

It is further recommended that he receive medical care for his reported Narcolepsy.

He should return to gainful employment once he is returned to the community.

I appreciate this opportunity to be of service.  If I may be of any further assistance in this or another case, please do not hesitate to call upon me.

I, Barton L. Jones, Ph.D., certify that I personally conducted this evaluation and prepared this report and all conclusions reflected are those of this expert and not of any third party.  I further certify that this evaluation was performed in a manner consistent with Chapter 490, Florida Statues, as well as with rules and regulations promulgated thereto.

Respectfully submitted,

*[signature]*

Barton L. Jones, Ph.D.
Licensed Psychologist
FL#: PY0005290